DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOHN P. WOODWARD,**
and **ROBERT C. WOODWARD,**
Appellants,

v.

**TIMOTHY J. MORELL,** in his capacity as Personal Representative of
**THE ESTATE OF MILDRED W. OLSON,**
Appellee.

No. 4D20-362

[May 5, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 50-2018-CA-010541-XXXX-MB.

Justin C. Carlin of The Carlin Law Firm, PLLC, Fort Lauderdale, and Daniel A. Seigel of Law Offices of Daniel A. Seigel, P.A., Boca Raton, for appellants.

John R. Hart, Dean A. Morande and Michael D. Sloan of Carlton Fields, P.A., West Palm Beach, for appellee.

GROSS, J.

Albert Einstein reportedly said, "Compound interest is the eighth wonder of the world. He who understands it, earns it. He who doesn't, pays it." This case arises from a couple's attempt to impart Einstein's wisdom to their nephews.

John P. Woodward, Robert C. Woodward, and Chris Woodward, three of the four Woodward brothers, brought a breach of contract claim against Timothy J. Morell, in his capacity as Personal Representative of the Estate of Mildred W. Olson (the "Estate").[1] The contract arose from a 1991 letter

---

[1] Chris Woodward withdrew from the action below. Only John P. Woodward and Robert C. Woodward are parties to this appeal. Unless otherwise specified in this opinion, the "Woodwards" and the "Woodward brothers" will refer to John and Robert.

sent by Mrs. Olson to her nephews, the four Woodward brothers. The Woodward brothers claimed that they had performed under the contract and that each was entitled to damages in excess of $100,000. The Woodward brothers and the Estate filed competing motions for summary judgment, all contending that the agreement at issue was clear and unambiguous. Concluding that the statute of limitations barred the brothers' claims, the trial court granted the Estate's Renewed Motion for Summary Judgment and denied the Woodwards' motion.

We affirm because the statute of limitations bars the Woodwards' contract claims.

In an appeal from a final summary judgment, we view the evidence in the light most favorable to the non-moving parties, the Woodwards. *Suker v. White Family Ltd. P'ship*, 193 So. 3d 1028, 1029 (Fla. 4th DCA 2016).

Mildred Olson and Dick Olson were the Woodwards' aunt and uncle. They had no children. On November 27, 1991, the Olsons mailed an agreement entitled "Woodward Nephews College and Savings Incentive Program" (the "Incentive Program") to each of their nephews. The Incentive Program states, in pertinent part:

> Dick and I want to encourage and help the four of you. To do this we are offering each of you an incentive proposal with the hope of accomplishing the following goals:
>
> A. **To encourage and reward you for going to college and graduating**.
>
> B. **To encourage you to save**.
>
> C. **To give you a bonus for savings** and **show you how your savings can accumulate for a major investment later on**, such as a home.
>
> As an incentive to accomplish these goals **Dick and I are offering <u>each of you</u> up to $7,000.00**, **and the opportunity to make that grow to $14,851.82** or **$29,703.54 over 4 years**, **depending on the amount of our commitment which you choose**.
>
> To start with, we make to each of you this commitment:

2

1. Following your completion of each year of college we will give you the following:

After freshman year...........$1,000.00
After sophomore year.........$1,500.00
After junior year...............$2,000.00
Upon graduation...............$2,500.00
      Total..........................................$7,000.00

This incentive money is meant to be a reward for progressing through college <u>and</u> to be seed money for a savings program. It is not intended as money you will need to go to college. . . .

2. For a period of 4 years, beginning one year after you complete your freshman year, as an additional incentive or encouragement to save, we will pay you a bonus of 25% on any of the above money that you maintain as a savings for a period of 1 year. This is how it will work. If you put the first $1,000.00 we give you into a savings account, leave it there for a year and earn 6% or $60.00 on it, resulting in $1,060.00 at the end of 1 year, we will add 25% ($265.00) to your savings, bringing your balance after 1 year up to $1,325.00 ($1,000.00 + $60.00 + $265.00 = $1,325.00). **Each year, in order for us to pay you the 25% bonus, it will be up to you to show us what you have saved for the past year.**

3. If you add any of your own savings (up to the amount of our yearly contributions, (i.e. if you add up to $1,000.00 the first year, $1,500.00 the second year, etc.), to the money which we give you, we will also pay you a bonus of 25% on your matching additional savings.

4. You can earn whatever you are able to earn on the money, **however if you want to lend part or all of the money back to us**, we will pay you 10% interest, compounded monthly, which comes out to a 10.47% annual return. **We are sure that this is more than you can safely earn anywhere else**.

**If you take full advantage of what we are offering** – by going through 4 years of college and saving all of the money we give you, earning 10% interest and the 25% bonuses, **you can accumulate $14,851.82** by the end of one year after you have finished college, as shown in spreadsheet # 1.

Of course if you add any of your own money to this and earn 10% per year plus the 25% bonus per year, you will have up to twice this amount by the end of your 4 years of college. Spreadsheet # 2 shows that **each of you can have $29,703.64 after just 4 years of savings, if you match our gifts** by saving and adding $7,000.00 over the first 4 years . . . .

This could give you a good financial start in life!

**Spread sheet # 3 shows you how your money grows the longer you are willing to leave it alone as savings**.  Even without adding any money of your own, if you just continue to allow the $14,851.82 to accumulate at 10% per year, this would grow to $2,624,440.78 in 50 years.  Wow!, you could all be millionaires!!!

Obviously there is no reason to leave this money alone forever.  However, these spreadsheets show you how much your money could grow, if you allowed it to accumulate . . . .

Life is a series of opportunities and **choices** and the **decisions** are not always easy.  What you do with your opportunities and choices, especially while you are young, will have a great effect on what you will be able to do later on.

. . . .

We want to leave you with the following thoughts:

1. Success takes planning and hard work.  It does not happen accidentally nor does it come over night.

. . . .

We are making a significant commitment to each of you . . . .

**To take the maximum advantage of our offer, it will take a joint effort from both of us**.  **The more you work and save, the more we will have to work to keep our end of the bargain**.

> **The decisions** as to how much of these opportunities **you choose** to take advantage of **is individually up to each of you**.
>
> Which ever paths each of you choose, the most important things are for you to have healthy, happy, and satisfying lives.

(Emphasis supplied).

Mrs. Olson attached a four-page narrative to share with her nephews the life choices that she and her husband had made, their hard work, their decision to live a modest lifestyle, and the real estate investments that led to their financial success.

The Woodwards each received a copy of the Incentive Program within a week of November 27, 1991.

Robert was 20 years old, and he had already completed his freshman year of college in 1990 when he received his copy of the Incentive Program. He thanked the Olsons either by phone or with a thank-you note. Robert did not recall any discussions with the Olsons regarding the Incentive Program. There was no discussion with them regarding lending them money. Robert completed his sophomore year in 1992, his junior year in 1993, and his senior year in 1997.

Although the Olsons owned much real estate, Robert did not think they "were financially able to actually send money" during that period of time, so he did not want to make demands based upon the Incentive Program. Robert never viewed the Incentive Program as a loan to the Olsons. He considered the Incentive Program as something that the aunt did for the brothers "out of the kindness of her heart" and "as a way of connecting with [the brothers]," and "among many other ways," to "let [them] know that she loved [them]."

In 1994, Mrs. Olson sent Robert and each of the brothers two spreadsheets that were to go with the Incentive Program. Spreadsheet #1 is one page long. The title of the spreadsheet is "Woodward Nephews' College/Savings Incentive Program." The subheading of the spreadsheet is as follows:

> AMORTIZATION TABLE
> SHOWING GIFTS TO WOODWARD NEPHEWS AND THE POTENTIAL
> GROWTH OVER 4 YEARS
> (**IF LENT BACK TO US AT 10% INTEREST** – COMPOUNDED MONTHLY)

(Emphasis supplied).

This spreadsheet shows the gifts after each year of college, the interest that could be earned based on a compound interest rate of 10%, the amount of accumulated principal and interest, and the 25% bonus after saving for one year. The spreadsheet shows an ending balance of $14,851.82 at the end of four years. There are a few notes at the end of the document. Note 3 states that "If nephews gradually add $7,000 (matching our gifts over 4 years): their balance will have grown to: $29,703.64."

While spreadsheet #2 has the same heading as spreadsheet #1, except for the number designation, the subheading is different and is as follows:

> SHOWING GIFTS TO WOODWARD NEPHEWS AND THE POTENTIAL GROWTH IF
> ALLOWED TO ACCUMULATE UP TO 50 YEARS
> (IF KEPT INVESTED AT 10% INTEREST – COMPOUNDED MONTHLY)

The spreadsheet shows an accumulated principal and interest of $1,449,627.01 at the end of 50 years. Contrary to what the Incentive Program indicates, there was no spreadsheet #3 in the spreadsheet packet.

The Woodwards were never given any money under the Incentive Program. Neither brother ever approached the Olsons about not being paid.

Robert and his family received gifts from their aunt from time to time. For example, he received a card with a check on his birthday every year. The check would be one dollar for each year he had been alive.

Robert saw the Olsons a few times after 1991, including a visit in May 2015 shortly after his uncle passed away and a 2016 cruise with his aunt.

The last gift Robert received from his aunt was a $14,000 check in 2016. The same amount was given to each of his three brothers.

John was about 14 or 15 years old and had not yet enrolled in college when he received the Incentive Program in the mail. He contacted the

Olsons and thanked them for the Incentive Program after receiving it in the mail. That was the only conversation he had with them regarding the Incentive Program. He told them that he "understood the message, the encouraging aspect to save," and he informed them that he wanted to fully participate in the program. After this 1991 conversation, John never spoke with the Olsons about the Incentive Program.

John considered that he had loaned the Olsons monies under the Incentive Program based upon the 1991 conversation. When he received the spreadsheet packet from his aunt in 1994, John took it as a confirmation that she understood that he had accepted paragraph 4 of the Incentive Program and that the monies would grow.

John completed his freshman, sophomore, and junior years in 1996, 1997, and 1998 respectively. He graduated from college in 2005.

In 1993, Mrs. Olson executed a last will and testament. Item III B of the will devised $20,000 to be divided among the Woodward brothers. Her will acknowledged the Incentive Program, which was given to "encourage them to finish college and to save," and it would be funded by her Estate.

In 2014, Mrs. Olson revoked the 1993 will. She executed a last will and testament in June 2015, which was admitted to probate after she passed away in March 2018. The 2015 will made no references to the Incentive Program.

After their aunt's death, each Woodward brother filed a statement of claim with the Estate. The Estate objected to the brothers' claims. They filed a breach of contract complaint against the Estate, which was later amended.

At the summary judgment hearing, the Woodwards' theory of their case was that: (1) they loaned funds back to the Olsons under paragraph 4 of the Incentive Program, even though no funds had ever been given under Paragraph 1; (2) the monies would stay with Mrs. Olson; (3) the funds would accrue interest at ten percent per year; (4) they could keep the monies with Mrs. Olson in perpetuity; and (5) they could collect the monies with interest whenever they wanted. As indicated, the trial judge granted the Estate's renewed motion for summary judgment, holding that the statute of limitations barred the claims.

### *The Statute of Limitations Barred the Woodwards' Claims*

Section 95.11 of the Florida Statutes provides for a five-year statute of limitations for "[a] legal or equitable action on a contract." § 95.11(2)(b), Fla. Stat. (2018). "[A] cause of action for breach of contract accrues at the time of the breach." *Access Ins. Planners, Inc. v. Gee*, 175 So. 3d 921, 924 (Fla. 4th DCA 2015). "[I]n the case of debts payable by installments, the statute of limitations runs against each installment from the day it becomes due." *Bishop v. State, Div. of Ret.*, 413 So. 2d 776, 778 (Fla. 1st DCA 1982).

Here, the right to the incentive money automatically vested upon the brothers' completion of each year of college. The statute of limitations for each incentive installment accrued upon Robert and John's completion of each year of school as follows:

|            | Robert     |             | John       |             |
|------------|------------|-------------|------------|-------------|
|            | Completion | SOL Expired | Completion | SOL Expired |
| Freshman   | 1990       | 1995        | 1996       | 2001        |
| Sophomore  | 1992       | 1997        | 1997       | 2002        |
| Junior     | 1993       | 1998        | 1998       | 2003        |
| Senior     | 1997       | 2002        | 2005       | 2010        |

The Woodwards did not bring an action against the Olsons until 2018, after the five-year statute of limitations had expired for each installment of the incentive money. For each installment, the right to obtain it vested when each Woodward completed a year of college. *See Isaacs v. Deutsch*, 80 So. 2d 657, 658 (Fla. 1955) (stating that "in a case such as this, as in the case of an obligation payable by instalments, the statute of limitations runs against each instalment from the time it becomes due; that is, from the time when an action might be brought to recover it" (quotation and citation omitted)); *Gee*, 175 So. 3d at 924 (holding that the employment contract promising to pay an employee a commission when the insurance underwriter received a premium was a divisible contract "meaning that the failure to pay each commission was a separate breach subject to its own . . . statute of limitations"). Florida law thus holds that the statute of limitations began to run when each installment was due: upon completion of each year of college. Because the Woodwards did not file claims until 2018, their actions are barred by the applicable statute of limitations.

### *The Lend-Back Provision Required the Woodwards to Communicate a Decision to the Olsons*

To avoid the application of the statute of limitations, the Woodwards argue that the terms of the Incentive Program allowed them to invoke the

lend-back provision in paragraph 4 of the Incentive Program by an implied election, that they could leave the money with the Olsons to accrue interest at 10% until they made a demand for payment, that their aunt did not breach the Incentive Program during her lifetime, and that the statute of limitations would begin to run only if the demands for payment were denied.

The language of the Incentive Program does not support the Woodwards' interpretation of it; the Program required them to communicate a decision on the lend-back option to the Olsons.

"[U]nambiguous [contractual] language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words," *Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. 4th DCA 2003), and the contractual language should be "read in the context of the document as a whole." *Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc.*, 929 So. 2d 729, 732 (Fla. 4th DCA 2006). The words in a contract "are the best possible evidence of the intent and meaning of the contracting parties." *Jacobs v. Petrino*, 351 So. 2d 1036, 1039 (Fla. 4th DCA 1976) (quoting *Wilcox v. Atkins*, 213 So. 2d 879 (Fla. 2d DCA 1968)).

"When contractual language is clear and unambiguous, courts cannot indulge in construction or interpretation of its plain meaning" and impose on the contractual parties "rights and duties" that the parties elected to omit. *BMW of N. Am., Inc. v. Krathen*, 471 So. 2d 585, 587 (Fla. 4th DCA 1985).

The purpose of the Incentive Program was to teach the brothers how to make wise financial decisions. The Incentive Program contains statements to encourage the brothers to take charge of their actions and make thoughtful choices:

> Dick and I are offering each of you up to $7,000, and the opportunity to make that grow to $14,851.82 or $29,703.54 over 4 years, depending on the amount of our commitment which you choose.

> Each year, in order for us to pay you the 25% bonus, it will be up to you to show us what you have saved for the past year.

> If you add any of your own savings . . .

You can earn whatever you are able to earn on the money, however if you want to lend part or all of the money back to us . . .

Life is a series of opportunities and choices and the decisions are not always easy. What you do with your opportunities and choices, especially while you are young, will have a great effect on what you will be able to do later on.

Success takes planning and hard work. It does not happen accidently nor does it come over night.

The decisions as to how much of these opportunities you choose to take advantage of is individually up to each of you.

Which ever paths each of you choose, . . .

As the trial court recognized, the Incentive Program does not include an option to make no choice and, by doing nothing, to trigger Paragraph 4 to lend the vested funds back to the Olsons at 10 percent annual interest, in perpetuity, until a demand is made. It is unreasonable to read the Incentive Program as allowing the Woodwards to make an implied election of the lend-back provision. The Incentive Program required them to communicate a decision to the Olsons.

Paragraph 1 of the Incentive Program states that the Olsons would "give" the Woodwards incentive funds "[f]ollowing your completion of each year of college." Paragraph 4 of the Incentive Program would have permitted Robert and John to "lend part or all of the money back to" the Olsons, but they could not do so before they had earned the right to receive the funds pursuant to Paragraph 1. Thus, aside from any issue arising from his age, John could not invoke the lend-back option as a teenager before he started college. It is undisputed that the Woodwards, after they became entitled to receive funds under the Program, neither discussed the Incentive Program with their aunt, nor communicated their desire to invoke the lend-back provision of the Program.

We agree with the Estate that the "stated purpose of the Incentive Program was to teach the nephews about personal responsibility; and personal responsibility could not be taught if the Woodwards had no responsibility to actually make a decision. The Woodwards' interpretation of the Incentive Program is directly contrary to what it is expressly meant to accomplish." (Answer Br. at 18). As a result, the Woodwards did not

invoke the lend-back provision under Paragraph 4 of the Incentive Program.

### *The Incentive Program Ended One Year After Each Woodward Brother's Respective Graduation*

Even assuming that the Woodwards had properly triggered the 10 percent lend-back provision, disregarding any argument that the lend-back provision was limited to four consecutive years, the statute of limitations would still have barred their claims against the Estate.

The 10 percent lend-back provision was for a limited term. For each brother, the duration of the Incentive Program ended one year after that brother's respective graduation from college. For Robert, the program ended in 1998; for John, in 2006. Any breach of the lend-back provision occurred prior to 2006. The 2018 lawsuit came well after the limitation periods had expired.

Under the Paragraph 4 lend-back provision, the brothers could "lend part or all of the money back" to the Olsons. The Incentive Program, in relevant parts, provides:

> Dick and I are offering each of you up to $7,000, and the opportunity to make that grow to $14,851.82 or $29,703.54 **over 4 years**, depending on the amount of our commitment which you choose.

> If you take full advantage of what we are offering, . . . you can accumulate $14,851.82 **by the end of one year after you have finished college**. . . . Of course if you add any of your own money, . . . each of you can have $29,703.64.

Careful and conservative when it came to money, the Olsons were not offering to fund a potential return of $1,000,000 for each brother. The Incentive Program did not state that the Olsons were allowing the Woodwards to park funds with them for 50 years at 10% compounded interest.

The two spreadsheets themselves confirm that the lend-back option was for a limited term.

Consistent with the language about the Incentive Program quoted above, Spreadsheet #1 shows a balance of $14,851.82 at the end of four years and, in a footnote, indicates a balance of $29,703.64 if matching

funds were received from the Woodwards. The subheading of the spreadsheet specifies that the calculation is based on if the incentive money is "LENT BACK TO [the Olsons] AT 10% INTEREST—COMPOUNDED MONTHLY."

Unlike Spreadsheet #1, Spreadsheet #2 is not tethered to the language of the Incentive Program and is illustrative only, showing the amount of potential growth from four years through 50 years. Nothing in Spreadsheet #2 suggests that the Olsons would continue to hold the funds as a loan after year four.

Even had the brothers availed themselves of the lend-back option, the 2018 lawsuit was filed well after the applicable statute of limitations had run.

*Affirmed.*

LEVINE, C.J., and KLINGENSMITH, J., concur.

*     *     *

**Not final until disposition of timely filed motion for rehearing.**